**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**RAYNALDO TORREZ CRUZ and LISA CRUZ,**

                                    **Plaintiffs,**

        **vs.**                                       **8:10-cv-219**
                                               **(MAD/CFH)**
**KUMHO TIRE CO., INC., KUMHO TIRE USA,**     **(Lead Case)**
**INC., and DACOTAH-WALSH TIRE**
**INCORPORATED,**

                                    **Defendants.**

_____
_____

**RAYNALDO TORREZ CRUZ and LISA CRUZ,**

                                      **Plaintiffs,**

        **vs.**                                       **8:12-cv-200**
                                               **(MAD/CFH)**
**MACK TRUCKS, INC. and BALLARD MACK**     **(Member Case)**
**SALES & SERVICE, INC.,**

                                    **Defendants.**

_____

**APPEARANCES:**                          **OF COUNSEL:**

**RHEINGOLD, VALET, RHEINGOLD,**       **TERRENCE E. McCARTNEY, ESQ.**
**McCARTNEY & GIUFFRA LLP**             **SCOTT D. KAGAN, ESQ.**
113 East 37th Street
New York, New York 10016
Attorneys for Plaintiffs

**MARTIN, HARDING & MAZZOTTI, LLP**     **CRAIG A. CUSHING, ESQ.**
1222 Troy-Schenectady Road            **VICTOR L. MAZZOTTI, ESQ.**
Niskayuna, New York 12309
Attorneys for Plaintiffs

**LITTLETON JOYCE UGHETTA PARK &**    **MICHAEL-HONG SIK BAI, ESQ.**
**KELLY LLP**                         **REBECCA L. ULISSE, ESQ.**
4 Manhattanville Road, Suite 202        **CHARLES S. TOOMEY, ESQ.**
Purchase, New York 10577
Attorneys for Defendants Kumho Tire Co, Inc.,
Kumho Tire USA, Inc., and Dacotah-Walsh

Tire Incorporated

**MAIMONE & ASSOCIATES PLLC**  **THOMAS J. MAIMONE, ESQ.**
150 Haven Avenue
Port Washington, New York 11050
Attorneys for Defendants Mack Trucks, Inc.,
and Ballard Mack Sales & Service, Inc.


**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

Plaintiffs allege causes of action against Defendants Kumho Tire Co., Inc. ("KTCI"),

Kumho Tire USA, Inc. ("KTUI"), and Dacotah-Walsh Tire Incorporated ("Dacotah-Walsh")

(collectively, the "Tire Defendants") and Defendants Mack Trucks, Inc. ("Mack") and Ballard

Mack Trucks Sales & Service, Inc. ("Ballard") (collectively, the "Mack Defendants") in

negligence, strict tort liability, breach of express and implied warranties, and loss of consortium

arising out of a single-vehicle truck accident that occurred on June 15, 2009.  *See* Dkt. No. 1-1;[1]

*Cruz v. Mack Trucks, Inc.*, No. 8:12-cv-200, Dkt. No. 1.  Presently before the Court are the Tire

Defendants' motion to preclude the expert testimony of Gary A. Derian and motion for summary

judgment and the Mack Defendants' motion to preclude the expert testimony of Erin Shipp,

Wayne McCracken, and David Smith and motion for summary judgment.  *See* Dkt. Nos. 81, 83.

**II. BACKGROUND[2]**

On June 15, 2009, Plaintiff Raynaldo Torrez Cruz was driving a 2005 Mack dump truck

bearing license plate number 69335JS (the "Subject Truck") on the northbound side of Route I-87

---

[1] Unless otherwise indicated, citations to docket entries refer to the docket for *Torrez Cruz
v. Kumho Tire Co., Inc.*, No. 8:10-cv-219.

[2] The following facts are undisputed unless otherwise noted.

in Plattsburgh, New York. *See* Dkt. No. 81-2, Tire Defendants' Statement of Material Facts, at ¶¶ 50, 52. At approximately 3:47 p.m., the Subject Truck's right front tire (the "Subject Tire"), a Kumho Powerfleet 983 size 425/65 R22.5 tire, failed. *Id.* at ¶¶ 53, 87. Mr. Cruz lost control of the Subject Truck and it left the roadway, entering an off-road wooded area approximately 500 feet from the roadway. *Id.* at ¶¶ 54, 56. When Mr. Cruz experienced loss of control of the vehicle, he used his CB radio to relay to other drivers making the trip with him that he had lost control. *See id.* at ¶ 55.

After the Subject Truck left the roadway, its engine and passenger compartment caught on fire. *Id.* at ¶ 54. Mr. Cruz tried opening the driver's side door of the passenger compartment to exit the vehicle, but the door was pinned with saplings. *Id.* at ¶ 62. He then tried opening the passenger's side door, but it was jammed. *Id.* Mr. Cruz then went back to the driver's side of the passenger cab to locate a hammer that he kept under the driver's seat. *Id.* at ¶ 63. As he was reaching under the seat for the hammer, the interior of the passenger cab was melting on him. *Id.* He then rolled down the passenger's side window and threw himself out of the window headfirst, landing on his shoulder. *Id.* He then made his way to the top of the road. *Id.* Mr. Cruz sustained injuries as a result of the accident. *Id.* at ¶ 42.

At the time of the accident, Mr. Cruz was driving the Subject Truck for his employer, Dick Glode Construction LLC ("DGCL"). *See id.* at ¶ 70. Richard Glode, the principal shareholder of DGCL, purchased the Subject Truck in new condition from Ballard in either 2004 or 2005. *See id.* at ¶ 68; Dkt. No. 83-2, the Mack Defendants' Statement of Material Facts, at ¶ 13.[3] The Subject Truck was designed such that the battery box was positioned "a few inches"

_____

[3] Mr. Glode testified at depositions on November 23, 2010 and August 6, 2013 that he purchased the Subject Truck in 2005. Dkt. No. 92-15 at 5; Dkt. No. 92-16 at 3. The Mack

(continued...)

from the front of the driver's side aluminum fuel tank. Dkt. No. 92-34 at ¶ 11. During the accident, the Subject Truck's front axle assembly was displaced from the frame rail and traveled rearward relative to the frame rail. *See id.*; Dkt. No. 94-1 at ¶ 11. Plaintiffs contend – and the Mack Defendants deny – that as a result, the steel frame of the battery box was driven rearward and impacted the driver's side aluminum fuel tank. *See* Dkt. No. 92-34 at ¶ 12; Dkt. No. 94-1 at ¶ 12. Plaintiffs further contend that the steel frame of the battery box's rupture of the aluminum fuel tank caused fuel to expel under pressure, vaporize, and escape the tank, meeting an ignition source and igniting the fire. *See* Dkt. No. 92-34 at ¶¶ 13-16. The Mack Defendants disagree that this sequence of events occurred and contend that the fire was possibly ignited by the Subject Truck's exhaust system or turbocharger. *See* Dkt. No. 94-1 at ¶¶ 12-16.

The Subject Truck was originally equipped with Goodyear tires, which remained on the vehicle for roughly one year. Dkt. No. 81-2 at ¶ 73. According to Mr. Glode, the Subject Tire was placed on the Subject Truck by DGCL mechanic Mark Duprey in the fall of 2008. Dkt. No. 81-40 at 5-6; *see also* Dkt. No. 81-2 at ¶ 88 (referencing Mr. Duprey's testimony that he believes he installed the Subject Tire in the fall of 2008). The Subject Tire was designed and manufactured by KTCI. *See* Dkt. No. 90-13 at 12. It was designed for use on dump trucks and as a mixed-use tire, meaning that it could be used both on and off of paved roads. *See* Dkt. No. 90-13 at 14, 28. A product data book for the Subject Tire model described the tire as "[d]esigned to provide good tread wear" and as having "enhanced traction cut and chip resistance in on/off-road applications." Dkt. No. 90-14 at 43-44 (internal quotation marks omitted). In a limited warranty

---

[3](...continued)
Defendants produced an invoice from Ballard to DGCL dated May 20, 2004 for one new 2005 Mack model CV713 truck, which they assert is the Subject Truck. *See* Dkt. No. 83-2 at ¶ 13; Dkt. No. 83-16. The Court will discuss this dispute as to the purchase date *infra* Section III.B.6.

for the Subject Tire model, KTUI warranted that the tire would remain serviceable until its tread depth was worn to 2/32 of an inch or five years from the date of manufacture, whichever came first. *See* Dkt. No. 90-14 at 49-50.

DGCL purchased numerous size 425 Kumho Powerfleet tires from both Dacotah-Walsh and a retailer named Terry's Tire Town throughout 2007 and 2008. *See* Dkt. No. 81-40 at 6, 14. Mr. Glode testified that he could not be one hundred percent sure that he purchased the Subject Tire from Dacotah-Walsh. *See id.*

Mr. Duprey testified that the tires on the front of DGCL's vehicles are usually changed at least once per year. Dkt. No. 81-2 at ¶ 71. Mr. Glode estimated that the typical service life of a tire on one of his vehicles was approximately 30,000 miles, although each tire was a little different. *Id.* at ¶ 73. Prior to the accident, DGCL had not rotated the tires on the Subject Truck. *Id.* at ¶ 76. The Subject Tire's original tread depth was 20/32 of an inch. *Id.* at ¶ 92. DGCL's practice was to change the front tires on its dump trucks prior to the tires reaching 4/32 of an inch of tread depth remaining, at which point New York State law requires the tires to be changed. *Id.* at ¶ 77. At the time of the accident, the Subject Tire's tread depth measured between 8/32 of an inch to 13/32 of an inch. *See* Dkt. No. 81-16 at 6; Dkt. No. 90-17 at 7.

Pursuant to his employment with DGCL, Mr. Cruz was required to keep a vehicle service logbook. Dkt. No. 81-2 at ¶ 86. The logbook contained a checklist of a visual vehicle inspection on which Mr. Cruz would note any discrepancies pertaining to a specific vehicle part that might require attention by Mr. Duprey. *See id.*; *see also* Dkt. No. 81-44 at 6-7. Specific to the vehicle's tires, Mr. Cruz testified that he visually and manually "checked the tires . . . [including] the tire itself, which consisted of tread and bulges or deep tears," every day. Dkt. No. 81-44 at 7. Mr. Cruz further testified that in his inspections of the Subject Truck, he reported "[n]o problems"

with the tires. *Id.* at 8. Additionally, Mr. Cruz testified that he checked the air pressure in both front tires of the Subject Truck on the morning of the accident and that both tires read 120 pounds per square inch ("PSI"). *Id.* at 25. Mr. Glode testified that on the morning of the accident, he saw Mr. Cruz check the pressure in all of the Subject Truck's tires. *See* Dkt. No. 81-40 at 6.

Mr. Glode also testified that he visually inspected DGCL's trucks "in the morning a lot of times," and that he and Mr. Duprey checked the trucks when they returned from runs. Dkt. No. 81-40 at 3. In addition to tread depth indicators, Mr. Glode observed the vehicles' tires for "any scuff marks on them or things like that," which would indicate the tire needed changing. *See* Dkt. No. 81-2 at ¶ 91. Mr. Glode did not notice any such marks on the Subject Tire. *Id.* Mr. Duprey testified that he checked the air pressure of the front steer tires of the Subject Truck with an air pressure gauge roughly two or three times per week. *See* Dkt. No. 81-41 at 3. He further testified that he inspected the Subject Truck's tires for missing chunks and signs of wear. *Id.* To Mr. Glode and Mr. Duprey's knowledge, the Subject Tire had not been damaged or repaired prior to the accident. *See* Dkt. No. 81-40 at 8; Dkt. No. 81-41 at 2-3.

On December 16, 2009, Plaintiffs filed a complaint in the New York State Supreme Court, Franklin County, alleging that the Subject Tire was defectively designed and manufactured. *See* Dkt. No. 81-2 at ¶¶ 43-44. The complaint alleges causes of action against the Tire Defendants in strict product liability, negligence, failure to warn, breach of express and implied warranties, and loss of consortium. *See id.* at ¶¶ 39, 45, 49.[4] KTCI, KTUI, and Kumho Industrial Co., Ltd.

---

[4] In addition to the Tire Defendants, the complaint also named Kumho Industrial Co., Ltd. and Kumho Development, Inc. as defendants. *See* Dkt. No. 90-1 at ¶ 1. Plaintiffs' claims against Kumho Industrial Co., Ltd. were dismissed by stipulation on August 30, 2012. *See* Dkt. No. 33. On November 17, 2010, Kumho Development, Inc. was removed from the action as an improper party by stipulation. *See* Dkt. No. 38. Dacotah-Walsh's cross-claims against KTCI and KTUI were dismissed by stipulation on May 23, 2011. *See* Dkt. No. 47.

removed the action to this Court on February 25, 2010. *Id.* at ¶ 2. On January 30, 2012, Plaintiffs

filed a complaint in this Court against the Mack Defendants, alleging that the Subject Truck was

defectively designed and that the Mack Defendants are liable in negligence, strict product

liability, failure to warn, breach of implied warranties, and loss of consortium. *See Cruz v. Mack*

*Trucks, Inc.*, No. 8:12-cv-200, Dkt. No. 1. On June 14, 2012, Plaintiffs' two actions were

consolidated for all purposes. *See* Dkt. No. 58.

On October 6, 2014, the Tire Defendants moved to preclude the expert testimony of

Plaintiffs' tire expert, Gary A. Derian, and for summary judgment. *See* Dkt. No. 81. On October

7, 2014, the Mack Defendants moved to preclude the expert testimony of Plaintiffs' truck design

expert, Erin Shipp, Plaintiffs' accident reconstruction expert, Wayne McCracken, and Plaintiffs'

fire cause and origin expert, David Smith, and for summary judgment. *See* Dkt. No. 83.

Plaintiffs oppose the motions. *See* Dkt. No. 90; Dkt. No. 92.

## III. DISCUSSION

**A.     Motions to preclude expert testimony**

    **1.     *Legal standards***

Pursuant to Rule 702 of the Federal Rules of Evidence, which governs the admissibility of

expert testimony,

> [a] witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if: (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of
> reliable principles and methods; and (d) the expert has reliably
> applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In reviewing the admissibility of expert testimony, "the district court has a

'gatekeeping' function under Rule 702 — it is charged with 'the task of ensuring that an expert's

testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). The rule set forth in *Daubert* applies to technical or other specialized knowledge, as well as scientific knowledge. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

As the Second Circuit has explained,

> [i]n fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Next, the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered. In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case. In short, the district court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Amorgianos*, 303 F.3d at 265-66 (internal alterations, quotation marks, and citations omitted).

Furthermore,

> [t]he Supreme Court has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Id.* at 266 (internal quotation marks and citations omitted). However, "[t]hese factors do not constitute . . . a 'definitive checklist or test,'" and "'[t]he inquiry envisioned by Rule 702 is . . . a flexible one.'" *Id.* (quoting *Daubert*, 509 U.S. at 593-94). The court must also consider the fact that "experience in conjunction with other knowledge, skill, training or education . . . [may] provide a sufficient foundation for expert testimony," and "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, Advisory Committee's Note; *see also Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266 (citation omitted). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* at 267. "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Id.* "The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Id.* (internal quotation marks and citation omitted). Accordingly, "gaps or inconsistencies" in an expert's reasoning, or arguments that an expert's conclusions are wrong, "go to the weight of the evidence, not to its admissibility." *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) (citations omitted). Likewise, disputes regarding the nature and strength of an expert's credentials, an expert's use or

application of his or her methodology, or the existence or number of supporting authorities for an expert's opinion go to the weight, not the admissibility of the expert's testimony. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995).

As the courts and Advisory Committee have made clear, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note; *see also Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) ("[B]y loosening the strictures on scientific evidence . . . , *Daubert* reinforces the idea that there should be a presumption of admissibility of evidence."). This presumption "recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos*, 303 F.3d at 267. As the Supreme Court has noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

However, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.[5] Furthermore, "it is critical that an expert's analysis be reliable at every step." *Id.* at 267. Thus, while the court's

---

[5] *See also Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358-60 (2d Cir. 2004) (holding that the district court properly did not consider expert testimony that was speculative and unreliable on summary judgment); *Dreyer v. Ryder Auto. Carrier Group, Inc.*, 367 F. Supp. 2d 413, 416-17 (W.D.N.Y. 2005) ("An otherwise well-credentialed expert's opinion may be subject to disqualification if he fails to employ investigative techniques or cannot explain the technical basis for his opinion."); *Dora Homes, Inc. v. Epperson*, 344 F. Supp. 2d 875, 887-89 (E.D.N.Y. 2004) (declining to consider plaintiff's expert's testimony in deciding pending motions for summary judgment based on a finding that the expert's testimony "is unreliable under Fed. R. Evid. 702 and the principles articulated in *Daubert* and its progeny," given that the expert (1) qualified his opinions with language that limited and sometimes negated his opinions; (2) failed to support his opinions with any methodology which the court could analyze; and (3) rested his opinions "upon nothing more than subjective belief and unsupported speculation").

focus is on the expert's principles and methodology, "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Accordingly, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered," and "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*

### 2. Mr. Derian

The Tire Defendants seek preclusion of Mr. Derian's expert testimony on the following grounds: (1) Mr. Derian lacks qualifications relevant to medium truck tires; (2) Mr. Derian's opinions concerning design and manufacturing defects are not reliable or sufficiently supported; and (3) Mr. Derian's accident causation opinions lack a sufficient basis. *See* Dkt. No. 81-3 at 12-21.[6]

### a. Mr. Derian's Qualifications

The Tire Defendants argue that Mr. Derian is not qualified to proffer opinions concerning the Subject Tire because he does not have experience designing, manufacturing, or testing medium truck tires. *See id.* at 12-13. The Tire Defendants also generally attack Mr. Derian's training and expertise related to tire design and manufacture as insufficient and point out that Mr. Derian does not have experience or training as a tire compounder or chemist. *See id.* at 13-14. Plaintiffs argue that Mr. Derian's extensive experience in the tire design and manufacturing field render him qualified to provide expert testimony as to the failure of the Subject Tire. *See* Dkt. no.

---

[6] The Tire Defendants also argue that Mr. Derian should be precluded from offering any opinions with respect to warnings because Plaintiffs did not disclose any such opinions during discovery. *See* Dkt. No. 81-3 at 20. As Plaintiffs have not indicated any intent to offer warning-related opinion testimony from Mr. Derian, the Court finds it unnecessary to address this argument.

90 at 9. Plaintiffs further argue that Mr. Derian does in fact have some experience with medium truck tires. *See id.* at 12. Plaintiffs additionally contend that the Tire Defendants' arguments go to the weight of Mr. Derian's testimony rather than to its admissibility. *See id.* at 13.

Upon review of Mr. Derian's engineer's reports, *cirriculum vitae*, and deposition testimony, the Court concludes that Mr. Derian is sufficiently qualified to proffer expert testimony regarding the design and manufacture of the Subject Tire. Mr. Derian earned a bachelor's degree in mechanical engineering, is registered as a professional engineer with the states of Ohio and North Carolina, and is a member of the Society of Automotive Engineers. *See* Dkt. No. 90-24 at 3. He was employed with BF Goodrich Company ("Goodrich") for twelve years, six years of which he designed passenger car tires. *See* Dkt. No. 81-22 at 6. While at Goodrich, Mr. Derian "analyze[d] thousands of failed tires." *Id.* at 8.[7] From 1990 to 2013, Mr. Derian investigated and analyzed hundreds of tires pursuant to his employment as a forensic engineer with Robson Forensic. *See id.* at 12-14. Mr. Derian is clearly qualified as an expert to testify regarding tire design and manufacture.

The Tire Defendants' argument that Mr. Derian is not qualified because he does not have experience specifically pertaining to medium truck tires is unavailing. "[A]ssuming that the proffered expert has the requisite minimal education and experience in a relevant field, courts have not barred an expert from testifying merely because he or she lacks a degree or training narrowly matching the point of dispute in the lawsuit." *Canino v. HRP, Inc.*, 105 F. Supp. 2d 21, 27 (N.D.N.Y. 2000) (citations omitted). "[W]here . . . well-trained people with somewhat more

---

[7] Mr. Derian indicated in his deposition testimony that he was not responsible for analyzing failed large or medium truck tires, but that he did so in collaboration with Goodrich's truck tire designers to gain insight he could apply to his passenger tire designs. *See* Dkt. No. 81-22 at 8, 10.

general qualifications are available, it is error to exclude them." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir. 1997). Additionally, here, both Mr. Derian and the Tire Defendants' liability expert, Joseph L. Grant, testified that the technical concepts of passenger or light truck tires are similar to those of medium and heavy-duty truck tires. *See* Dkt. No. 81-22 at 16; Dkt. No. 90-19 at 194. Thus, Mr. Derian's opinions regarding the design and manufacture of the Subject Tire "stay within the reasonable confines of his subject area." *Lappe v. Am. Honda Motor Co., Inc.*, 857 F. Supp. 222, 227 (N.D.N.Y. 1994) (citation omitted). The Tire Defendants' remaining arguments regarding Mr. Derian's qualifications constitute the type of "'quibble' over an expert's experience, academic training, and other alleged shortcomings" that the Second Circuit has held "go to the weight and credibility of an expert's testimony instead of the admissibility of his opinions." *Milliman v. Mitsubishi Caterpillar Forklift Am., Inc.*, 594 F. Supp. 2d 230, 237 (N.D.N.Y. 2009) (quoting *McCullock*, 61 F.3d at 1043).

### b. Mr. Derian's Opinions as to Design and Manufacturing Defects

The Tire Defendants next argue that Mr. Derian's design and manufacturing defect opinions are not reliable and unsupported. *See* Dkt. No. 81-3 at 15-20. As to design defect, the Tire Defendants argue that Mr. Derian cannot identify any support for his opinion that high twist, high elongation wires or a stronger tensile strength wire in the Subject Tire's No. 4 steel belt would have made the tire more suitable for its intended use. *See id.* at 16-17. Plaintiffs offer no argument in support of Mr. Derian's design defect opinions. *See* Dkt. No. 90 at 14-21. Moreover, Plaintiffs' opposition to the Tire Defendants' motion for summary judgment addresses only a manufacturing defect theory and not a design defect theory. *See id.* at 23-26. As Plaintiffs apparently concede that they cannot establish a design defect, any testimony by Mr. Derian as to a design defect would be irrelevant and is precluded.

13

As to Mr. Derian's opinion that the Subject Tire failed due to poor adhesion caused by a manufacturing defect, the Tire Defendants argue that this opinion is unreliable because Mr. Derian did not perform a number of tests they argue could have supported or negated his opinion. *See* Dkt. No. 81-3 at 19. Mr. Derian's opinions regarding the failure of the Subject Tire are based largely on a visual and tactile inspection of the Subject Tire performed with moderate power microscopy. *See* Dkt. No. 81-16 at 4. Plaintiffs contend that such an inspection is a standard methodology employed by all tire experts. *See* Dkt. No. 90 at 14. The Tire Defendants offer no evidence to the contrary. In fact, the Tire Defendants' own expert, Mr. Grant, utilized the same methodology in forming an opinion as to the cause of the Subject Tire's failure. *See* Dkt. No. 90-17 at 5; Dkt. No. 90-19 at 94-95. Furthermore, Mr. Derian was unable to perform the tests suggested by Defendants because of the damaged condition of the tire. *See* Dkt. No. 81-22 at 43-44. In light of Plaintiffs' uncontested evidence that Mr. Derian's methodology is generally accepted and commonly utilized in his field, the Court concludes that Mr. Derian's opinion is based on reliable principles and methods.

The Tire Defendants' remaining arguments amount to an assertion that Mr. Derian's ultimate conclusions are unreliable. Although the court may exclude an expert opinion "that is connected to existing data only by the *ipse dixit* of the expert," *Gen. Elec. Co.*, 522 U.S. at 146, this is not one such case. Here, Mr. Derian concluded that the Subject Tire failed due to poor adhesion based on "large areas of the rubber coating for the second steel belt that separated without leaving significant tear patterns in the rubber." Dkt. No. 81-16 at 5. He explained that the smooth areas he observed "indicate the rubber layers [of the tire] were never properly vulcanized into a single layer of rubber." *Id.* He further explained that "[i]n a properly cured tire, it is very difficult to separate the various layers along their original surfaces," such that separating

the layers requires "tearing the rubber apart," which "leaves distinct marks on the rubber layers." *Id.* at 6. Mr. Derian therefore considered the separation of individual layers of the Subject Tire without distinct tear marks as evidence of poor adhesion. *See id.*[8]

The Tire Defendants argue that this conclusion is unsupported and speculative. *See* Dkt. No. 81-3 at 17-19. However, Mr. Derian testified that his opinion was based in part on his experience at Goodrich, where he and his colleagues performed ply pull tests and would consider the separation of plies at their original interfaces as evidence of poor adhesion. *See* Dkt. No. 81-22 at 62. Additionally, Mr. Derian identified a number of industry publications that support his poor adhesion theory. *See* Dkt. No. 81-16 at 10; Dkt. No. 81-23 at 7; Dkt. No. 90-23 at ¶¶ 57-59. Furthermore, the Tire Defendants' tire expert agreed that physical evidence of poor adhesion would include a tire "that is coming apart pretty much all at that particular interface or interfaces," thereby acknowledging the viability of Mr. Derian's poor adhesion theory and supporting Mr. Derian's assertion of how poor adhesion can be observed. Dkt. No. 90-19 at 33-34.

The Tire Defendants' argument that Mr. Derian's opinions are not "tied to case facts," Dkt. No. 97-1 at 5, is also unavailing, as Mr. Derian supports his opinion with specific observations regarding the Subject Tire. The Tire Defendants' reliance on *Brooks v. Outboard Marine Corp.*, 234 F.3d 89 (2d Cir. 2000), is therefore misplaced. In that case, which involved a boating accident, the district court excluded the testimony of an expert witness who sought to testify that a boat motor was defective because it did not contain a propeller guard or emergency shut-off device as unreliable and speculative. *See Brooks*, 234 F.3d at 90-91. The Second Circuit affirmed, noting that the proposed expert had never examined the actual boat or motor, had never

---

[8] In light of this explanation, which was offered in Mr. Derian's original expert report, the Tire Defendants' argument that Mr. Derian "fails to explain the technical basis for his opinion" is without merit. Dkt. No. 97-1 at 5.

spoken to the individuals involved in the accident, did not know the dimensions of the boat and motor, and did not know how the accident unfolded. *See id.* at 92. In contrast, Mr. Derian's opinions were based on inspections of the Subject Tire and Truck, the companion front tire, a large tread segment from the Subject Tire found near the accident site, and an exemplar failed Kumho tire, a visit to the quarries where Mr. Cruz hauled materials, and a review of relevant documents and deposition testimony from the Tire Defendants and Plaintiffs. *See* Dkt. No. 81-16 at 2-4; Dkt. No. 81-23 at 3. Thus, *Brooks* is clearly inapposite to this case.

The Tire Defendants argue that Mr. Derian's opinion is nonetheless unreliable because it is discredited by a number of peer-reviewed papers. *See* Dkt. No. 81-3 at 18. However, "[w]here an expert otherwise reliably utilizes scientific methods to reach a conclusion," arguments regarding the strength of the textual support for an opinion "may 'go to the weight, not the admissibility' of the expert's testimony." *Amorgianos*, 303 F.3d at 267 (quoting *McCullock*, 61 F.3d at 1044) (other citation omitted). Similarly, the Tire Defendants' contentions that Mr. Derian failed to consider certain relevant documents such as design and manufacturing specifications and warranty adjustment data for the Subject Tire go to the weight of his testimony. *See McCullock*, 61 F.3d at 1044 (characterizing disputes as to faults in an expert's use of a methodology as affecting the weight, not admissibility of the expert's testimony).

In sum, despite the Tire Defendants' claim that "[t]his is not a case of experts disagreeing, credibility determination or weighing the evidence," Dkt. No. 97-1 at 12, the Court is confronted with two expert theories of why the Subject Tire failed that are based on the same methodology and similar data, but reach different conclusions. "It is not for the court to decide which expert opinion is more persuasive. The conflicting opinions 'merely create[] a credibility question for the jury to resolve . . . .'" *Rand v. Volvo Fin. N. Am., Inc.*, No. 04-CV-00349, 2007 WL 1351751,

*3 (E.D.N.Y. May 8, 2007) (quoting *Holbrook v. Jamesway Corp.*, 172 A.D. 2d 910, 911 (3d Dep't 1991)).  The Court therefore denies the Tire Defendants' motion to preclude Mr. Derian's testimony as to a manufacturing defect.

### c. Mr. Derian's Accident Causation Opinion

The Tire Defendants also seek to preclude Mr. Derian from proffering the opinion that the Subject Tire's failure caused Mr. Cruz to crash because Mr. Derian did not perform an accident reconstruction and because his testimony would be cumulative to Mr. McCracken's testimony. *See* Dkt. No. 81-3 at 20-21; Dkt. No. 97-1 at 10-11.  The Court cannot determine whether Mr. Derian's testimony as to accident causation is cumulative or prejudicial without the benefit of observing the evidence presented at trial.  *See Queen v. Int'l Paper Co.*, No. 04-CV-342, 2006 WL 1229010, *2 n.2 (N.D.N.Y. May 5, 2006).  Accordingly, the Court denies the Tire Defendants' motion to preclude Mr. Derian from testifying regarding accident causation without prejudice to renewal.

### 3. Ms. Shipp

Ms. Shipp, Plaintiffs' truck design expert, proposed three alternative designs that she opines would have prevented the breach of the Subject Truck's fuel tank and therefore prevented the resulting fire: (1) a strengthened front axle assembly and improved front bumper guard; (2) placement of the battery box in front of the right second axle or between the frame rails; and (3) use of a stronger material than aluminum for the fuel tanks, double-wall fuel tanks, or a fuel tank guard.  *See* Dkt. No. 92-23 at 12-15.  The Mack Defendants do not challenge that Ms. Shipp is qualified to testify as an expert, but argue that Ms. Shipp's testimony as to each of her proposed alternative designs is unreliable and speculative because her designs have been neither tested nor utilized within the trucking industry.  *See* Dkt. No. 83-3 at 8-15.  Plaintiffs argue that Ms. Shipp's

proposed alternative designs are nonetheless admissible because they are supported by relevant industry literature and developed using accepted scientific techniques. *See* Dkt. No. 92 at 12-13.

The Mack Defendants argue, in essence, that a proposed alternative design is only reliable, and thus admissible, if it has been tested by an expert or accepted within the industry. However, "[w]hile the testing of a prototype is undoubtedly one of the preferred methods for determining the reliability of an expert's opinion, testing is not necessarily a requirement for the admission of expert testimony." *Milliman*, 594 F. Supp. 2d at 239 (citations omitted). For instance, in *Milliman*, the plaintiff's mechanical engineering expert planned to testify regarding proposed alternative designs to an orderpicker. *See id.* at 235.[9] The defendant argued that the expert's proposed designs were unreliable because the expert had not constructed and tested prototypes of his proposed designs or identified existing orderpickers that incorporated his suggested features. *See id.* at 238. The court first noted that the basis for the expert's proposed designs was his experience in the field of biomechanics and mechanical engineering, explaining that "[i]nstead of constructing an orderpicker incorporating his own alternative design, Dr. Engin states that his review of the materials he was presented, together with his experience in the relative field of mechanical engineering, [led] him to believe defendant should have manufactured an orderpicker with his proposed design changes." *Id.* at 238-39. Thus, the relevant issue before the court was not an "imperfect application of the *Daubert* factors," but "whether [the expert's] experience and training in these areas provide[d] an independent and reliable basis for each of his

---

[9] An orderpicker is a forklift-like machine that is used to lift employees above the ground, as in a warehouse where employees retrieve products from high shelves. *See Milliman*, 594 F. Supp. 2d at 234. The plaintiff in *Milliman* was injured when he fell a distance from an orderpicker sold by the defendant, which included a warning label instructing its operators to wear a safety harness while operating the machine at elevation. *See id.* at 234-35. At the time of the plaintiff's injury, he was not wearing a safety harness, and no safety tether or harness was attached to the orderpicker. *See id.*

opinions." *Id.* at 239.

As to Dr. Engin's proposed design of permanently attaching an existing safety tether and harness to the orderpicker, which he explained was based on his interpretation of an applicable safety standard of the American National Standards Institute, the court observed that the design alteration "[did] not rise to the level of intricacy or scientific complexity requiring testing of his proposed design changes." *Id.* at 240. The court therefore concluded that Dr. Engin's extensive experience, review of the relevant materials, and interpretation of the applicable safety standards constituted a reliable basis for his opinion. *Id.* However, the court found Dr. Engin's proposed design of incorporating an interlock device insufficiently reliable because (1) Dr. Engin had never designed an orderpicker with an interlock device and could not identify an orderpicker with such a device, "thereby calling into question the feasibility of his alternative design"; (2) Dr. Engin's only basis for his opinion that such a design was possible was that "other machines entirely different from orderpickers utilize interlock devices"; (3) Dr. Engin conducted no research into the cost of an interlock device; and (4) no safety standard open to interpretation arguably called for an interlock device. *Id.* at 240-41.

The District Court for the Western District of New York considered a similar challenge to an expert's proposed alternative designs in *Colombo v. CMI Corporation*, 26 F. Supp. 2d 574 (E.D.N.Y. 1998). There, the defendant sought preclusion of the plaintiff's expert testimony concerning design defects in a pavement profiler. *See Colombo*, 26 F. Supp. 2d at 575. Noting that the expert's proposed testimony "[did] not 'present the kind of "junk science" problem that *Daubert* meant to address,'" the court denied the defendant's motion. *Id.* (citations omitted). The court explained that although "defendant points out that Dr. Paul can offer no tests, and no prototypes or drawings of satisfactory machinery," in the court's view, "these are precisely the

kind of matters that should be left for the jury to consider in assessing the weight to be given to Dr. Paul's testimony." *Id.* at 577.

In comparison, in *Zaremba v. General Motors Corporation*, the district court excluded an engineer's proposed expert testimony regarding an alternative safer design for a Pontiac Trans Am upon its findings that, *inter alia*, the expert (1) had not examined or tested the vehicle; (2) made no drawing or model of his proposed alternative design; (3) did not test his design; (4) offered no calculations in support of the safety of his design; (5) had not subjected his alternative design to peer review and evaluation; and (6) presented no evidence that the automobile design community "accepted the untested propositions underlying his opinions." *Zaremba*, 360 F.3d at 357. The only support the expert identified for his proposed design was a memorandum from General Motors that referred to testing of a design similar to the expert's proposed design and concluded that the tested design would have improved certain performance aspects of the vehicle. *See id.* at 359. The Second Circuit affirmed, concluding that "[i]n the absence of drawings, models, calculations, or tests, it was not manifest error for the District Court to find that [the expert's] testimony was insufficiently reliable." *Id.*

In the instant matter, Plaintiffs concede that Ms. Shipp has not physically tested a prototype of her proposed alternative designs and cannot identify a truck manufacturer that currently incorporates her design proposals. *See* Dkt. No. 92 at 13-14. However, Plaintiffs argue that as in *Milliman*, Ms. Shipp's extensive truck design experience and her review of relevant materials form a sufficiently reliable basis to render her proposed designs admissible. Additionally, each of Ms. Shipp's proposed alternative designs draws support from the 1989 U.S. Department of Transportation DOT HS 807 484 Final Report, *Heavy Truck Fuel System Fire Safety Study* ("the University of Maryland Study"), *see generally* Dkt. No. 92-24, as well as other

relevant industry literature. Ms. Shipp also represents that her proposed designs are based on "numerous engineering calculations regarding the strength and weight characteristics of [her] proposed alternative designs as well as other relevant issues" and an "appropriate risk-utility analysis," pursuant to which she "concluded that the high risk of post-collision fire in reasonably foreseeable collisions in the subject Mack truck outweighs the utility of the as-built design." Dkt. No. 92-22 at ¶¶ 4, 11.

As to the front axle and front bumper assembly specifically, Ms. Shipp proposes to recommend adding a tether cable to the front axle attachment system and utilizing an improved bumper guard. *See* Dkt. No. 92-23 at 12. The University of Maryland Study's strategies for fuel discharge minimization includes "strengthening the attachments of [components including the front axle leaf springs and tires] to the frame or shielding them with additional, lower front end structures to prevent dislocation under some accident scenarios." Dkt. No. 92-24 at 103. In addition, a reinforced front bumper design similar to Ms. Shipp's proposed design is depicted in the 1987 U.S. Department of Transportation DOT HS 807 109 Final Report, *Heavy Truck Safety Study*. *See* Dkt. No. 92-28 at 49. Furthermore, Ms. Shipp constructed an exemplar reinforced front bumper built to her design specifications and attached to an exemplar heavy truck chassis, *see* Dkt. No. 92-22 at ¶ 4; Dkt. No. 92-36, and patented an Energy Absorbing Front Frame Structure similar to her proposed bumper guard design, *see* Dkt. No. 92-22 at ¶ 1.

In light of the support Plaintiffs have identified for Ms. Shipp's proposed alternative front bumper design, the Court finds that her proposed design is sufficiently reliable to be presented to the jury. As discussed above, contrary to the Mack Defendants' contention, the fact that Ms. Shipp has not tested her prototype does not "render[] her opinion nugatory." Dkt. No. 83-3 at 13. Ms. Shipp utilized accepted engineering calculations and risk-utility analysis in developing her

design, which draws support from relevant industry studies. Unlike the precluded expert testimony in *Zaremba*, Ms. Shipp's proposed design plainly has a "'concrete basis in reality.'" *Zaremba*, 360 F.3d at 357. Moreover, although the Mack Defendants argue that Ms. Shipp "cannot reliably state that [her design] would have prevented the axle being broken off from impact in this case," Dkt. No. 83-3 at 13, "[w]hether an alternative design is safer presents a question of fact, not law, for the jury to decide." *Congilaro v. Crown Equip. Corp.*, No. 5:09-CV-1452, 2012 WL 3821952, *3 (N.D.N.Y. Sept. 4, 2012). The Mack Defendants' remaining arguments concerning the fact that Ms. Shipp's proposed designs are not utilized by the trucking industry and the perceived shortcomings in Ms. Shipp's methodology are "precisely the kind of matters that should be left for the jury to consider in assessing the weight to be given" to her testimony. *Colombo*, 26 F. Supp. 2d at 577.

Ms. Shipp's second proposed alternative design involves relocating the battery box farther from the fuel tank, such as ahead of the right second axle or between the frame rails. *See* Dkt. No. 92-23 at 13-14. The University of Maryland Study suggests battery box relocation as a strategy for minimizing fuel discharge, as does the 1986 U.S. Department of Transportation DOT HS 807 081 National Highway Traffic Safety Administration Technical Report, *Truck Occupant Protection*. *See* Dkt. No. 92-24 at 118; Dkt. No. 92-25 at 88 ("During NHTSA visits, one manufacturer pointed out that one of their new truck designs incorporated a relocation of the batteries under the cab, in part to reduce the likelihood of fires in a collision."). Moreover, like the expert's proposal to replace an attachable safety tether and harness with a permanent one in *Milliman*, Ms. Shipp's proposals to simply relocate the battery box in an available space "do not rise to the level of intricacy or scientific complexity requiring testing of [her] proposed design changes." *Milliman*, 594 F. Supp. 2d at 240.

Finally, Ms. Shipp proposes strengthening the fuel tank by using a stronger material such as steel or a double tank wall to absorb and distribute impacts or by adding a fuel tank guard. *See* Dkt. No. 92-23 at 15. Again, this design is suggested by the University of Maryland Study as a potential strategy for reducing fuel discharge, *see* Dkt. No. 92-24 at 115, and is based on Ms. Shipp's truck design and engineering expertise. The Mack Defendants' assertions that the Subject Truck's fuel tank complied with all applicable industry standards and government-mandated tests does not compel the preclusion of evidence suggesting that the fuel tank was defective. *See* Dkt. No. 83-3 at 9. "Compliance or lack of compliance with industry safety standards . . . is not dispositive of the issue of a design defect and other evidence concerning the design and safety of the machine may be considered." *Clarke v. LR Sys.*, 219 F. Supp. 2d 323, 334 (E.D.N.Y. 2002) (quotation omitted); *accord Montalvo v. Rheem Textile Sys., Inc.*, No. 86 CIV. 9501, 1991 WL 52777, *3 (S.D.N.Y. Apr. 4, 1991) ("Whether a product meets relevant safety regulations is only one indicium of whether a product is designed with reasonable care.") (citation omitted).

To summarize, Ms. Shipp's proposed designs draw sufficient support from her experience, accepted engineering methodologies, and relevant industry literature to render them sufficiently reliable to present to the jury. The Mack Defendants are free to raise their criticisms regarding Ms. Shipp's designs to the jury. Accordingly, the Court denies the Mack Defendants' motion to preclude Ms. Shipp's testimony.

### 4. *Mr. McCracken*

The Mack Defendants concede that Mr. McCracken, Plaintiffs' accident reconstruction engineer, is qualified to opine on the sequence of events that caused the vehicle fire, *see* Dkt. No. 83-3 at 15, and do not take issue with Mr. McCracken's methodology or his application of

accident reconstruction principles. Instead, they contend that Mr. McCracken's opinions are unreliable because he "cannot recount with any certitude the sequence of events that led to the fire." *Id.* Specifically, the Mack Defendants assert that Mr. McCracken "cannot pinpoint the location of obstacles that were struck by the truck" and cannot "fix a point in the accident sequence when diesel fuel would have been available in an atomized state . . . to ignite the fire." *Id.* at 17. However, the Mack Defendants do not explain why Mr. McCracken's inability to state exactly where each obstacle struck the Subject Truck undermines his stated opinion as to the origination of the fire. As to the inability to pinpoint when the fuel tank was breached, the Mack Defendants contend that Mr. McCracken's fire theory requires evidence that the fuel tank breach and arcing battery wires "happened in close proximity to each other," and that Mr. McCracken has no evidence of this temporal connection. Dkt. No. 94 at 8. As with many of the Mack Defendants' arguments, such an argument goes to the weight of Mr. McCracken's opinion, not its admissibility, and is properly addressed to the jury. Notably, the Mack Defendants provide no legal support for their contention that an expert must precisely identify each and every occurrence within an accident sequence to testify to an accident causation opinion. *See* Dkt. No. 83-3 at 15-17; Dkt. No. 94 at 8-9.

*BancFirst v. Ford Motor Co.*, 489 Fed. Appx. 264 (10th Cir. 2012), the only case which the Mack Defendants reference, does not compel a different result.[10] There, the district court precluded an expert's testimony as to an accident sequence that directly contradicted the driver's testimony as to how the accident occurred and was not supported by any evidence from the accident scene. *See BancFirst*, 489 Fed. Appx. at 265-66. In contrast, here, the Mack Defendants

---

[10] The Mack Defendants cite to *BancFirst* for the unassailable proposition that an accident reconstruction opinion – like all expert opinions – must be predicated on scientific knowledge, data, and evidence, rather than mere speculation. *See* Dkt. No. 83-3 at 16.

do not dispute that Mr. McCracken's opinion is supported by physical evidence from the accident. *See* Dkt. No. 92-19 at 3-4.  Mr. McCracken's opinion is therefore not merely speculative. Furthermore, contrary to the Mack Defendants' assertions, Mr. McCracken's disagreement with Mr. Glode's description of the topography of the area through which the Subject Truck traveled after leaving the highway, based on Mr. McCracken's own inspection of the accident site, does not render his opinion unreliable.  *See* Dkt. No. 92 at 25-26.

The Mack Defendants' quibbles with Mr. McCracken's conclusions are insufficient to justify preclusion of his opinions.  Thus, the Court denies the motion to preclude Mr. McCracken's testimony.

### 5. *Mr. Smith*

As with the testimony of Mr. McCracken, the Mack Defendants do not take issue with Mr. Smith's qualifications, methodology, or application of scientific principles.  Their arguments as to why Mr. Smith's opinions are unreliable and inadmissible are nearly identical to their arguments concerning Mr. McCracken's testimony – namely, that Mr. Smith's opinion suffers from a "lack of precision" and inability to "pinpoint points where the fuel tank was breached or the wire allegedly arced."  Dkt. No. 83-3 at 18; *see also* Dkt. No. 94 at 8-9.  For the reasons discussed above, these alleged shortcomings are insufficient to require preclusion of Mr. Smith's testimony.  Similarly, the Mack Defendants' arguments concerning Mr. Smith's inability to definitively rule out other ignition sources go to the weight of Mr. Smith's testimony.  *See Allstate Ins. Co. v. Gonyo*, No. 8:07-CV-1011, 2009 WL 1212481, *6 (N.D.N.Y. Apr. 30, 2009) ("If there is any question that [the fire investigator] did not eliminate every cause for the fire, this will not be determinative as to whether he will testify; all that it suggests is that the credibility of his decision may be subject to an attack.").  While Mr. Smith acknowledged that other ignition sources were possible, *see* 83-

15 at 56, he was able to formulate his opinion as to the fire's origin "to a reasonable degree of scientific probability." Dkt. No. 92-30 at 5.

The Mack Defendants' remaining argument, that Mr. Smith's opinion is unreliable because he ignored the possibility that one of the flammable liquids released during the accident other than atomized diesel fuel was the "first fuel" igniting the fire, *see* Dkt. No. 83-3 at 18-19, is belied by Mr. Smith's deposition testimony. Mr. Smith testified that he considered and excluded the probability that each of the other present flammable liquids was the first fuel ignited. *See* Dkt. No. 92-7 at 12-13. The Court therefore denies the Mack Defendants' motion to preclude Mr. Smith's expert testimony.

## B. Motions for summary judgment

### 1. *Standard of review*

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the

motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

## 2. *Design defect*

Under New York law, a plaintiff alleging a strict liability claim for defective design must show "(1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing the plaintiff's injury." *Clarke*, 219 F. Supp. 2d at 330 (citing *Voss v. Black & Decker Mfg. Co.*, 59 N.Y. 2d 102, 107 (1983); *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125 (2d Cir. 1999)).[11] To establish a negligence claim for defective design, a plaintiff must allege "(1) the manufacturer owed the plaintiff a duty to exercise reasonable care; (2) a breach of that duty that results in a defective product; (3) the defect was the proximate cause of the plaintiff's injury; and (4) loss or damage." *Id.* (citing *Becker v. Schwartz*, 46 N.Y.2d 401, 410 (1978); *McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997)). "'In a design defect case, there is almost no difference between a *prima facie* case in negligence and one in strict liability,'" and thus such claims are commonly analyzed together. *Rupolo v. Oshkosh Truck Corp.*, 749 F. Supp. 2d 31, 43 n.4 (E.D.N.Y. 2010) (quoting *Searle v. Suburban Propane Div. of Quantum Chem. Corp.*, 263 A.D.2d 335, 338 (3rd Dep't 2000)).

---

[11] The parties do not dispute that this action is governed by New York product liability law.

A product design is not reasonably safe, and therefore defective, when "if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." *Voss*, 59 N.Y.2d at 108. Whether a product was not reasonably safe is a question for the jury to decide in light of all of the evidence presented by both parties. *See id.*

> The plaintiff, of course, is under an obligation to present evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner. The defendant manufacturer, on the other hand, may present evidence in opposition seeking to show that the product is a safe product – that is, one whose utility outweighs its risks when the product has been designed so that the risks are reduced to the greatest extent possible while retaining the product's inherent usefulness at an acceptable cost. The question for the jury, then, is whether after weighing the evidence and balancing the product's risks against its utility and cost, it can be concluded that the product as designed is not reasonably safe.

*Id.* (citations omitted).

The Tire Defendants argue that Plaintiffs cannot satisfy their burden of proof on a defective design theory because they have not proffered any evidence of a design defect. *See* Dkt. No. 81-3 at 23-24. The Tire Defendants further contend that even if Mr. Derian's suggestions regarding the tire belt cords could be construed as a design defect opinion, Mr. Derian admitted that any such defect did not, in his opinion, cause the tire's failure. *See* Dkt. No. 81-22 at 92. As the Court noted *supra*, Plaintiffs have not responded to the Tire Defendants' arguments concerning a design defect in the Subject Tire. Accordingly, in the absence of any indication that Plaintiffs have produced evidence of a design defect that caused Mr. Cruz's injuries, the Court grants the Tire Defendants' motion for summary judgment as to a design defect theory of liability.

The Mack Defendants' sole argument in support of its motion for summary judgment as to Plaintiffs' design defect claims is that New York law requires competent expert testimony as to a

feasible alternative design, unless a reasonable alternative design is "'both obvious to, and understandable by, a layperson.'"  Dkt. No. 83-3 at 23 (quoting *Guarascio v. Drake Assocs. Inc.*, 582 F. Supp. 2d 459, 463 (S.D.N.Y. 2008)).  As the Court has already determined that Ms. Shipp's proposed alternative design testimony is competent, this argument is unavailing.  The Court therefore denies the Mack Defendants' motion for summary judgment as to Plaintiffs' design defect claims.

### 3.    *Manufacturing defect*

To prove a manufacturing defect under New York law, a plaintiff must show "that a specific product unit was defective as a result of 'some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction,' and that the defect was the cause of plaintiff's injury." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 85 (S.D.N.Y. 2001) (quoting *Caprara v. Chrysler Corp.*, 52 N.Y.2d 114, 129 (1981)).  "In other words, a manufacturing flaw exists when the unit in question deviates in quality and other performance standards from all of the other identical units." *Id.*  To establish a strict liability claim based on a manufacturing defect, the plaintiff must show that the defect "render[ed] the product not reasonably safe and is the proximate cause of injury," regardless of the care exercised by the manufacturer. *Id.* at 85-86 (citing *Caprara*, 52 N.Y.2d at 128-29).  "A manufacturer is liable in negligence for injury caused by a defective product if it failed to exercise due care in the production of such product." *Id.* at 86 (citing *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 185 (E.D.N.Y. 2001)).

Here, the Tire Defendants contend that even with Mr. Derian's proposed testimony, Plaintiffs have failed to establish a manufacturing defect because "Mr. Derian had no opinion that the Subject Tire deviated in quality and other performance standards from other Kumho

Powerfleet 983, size 425/65R22.5 tires that were manufactured around the same time, even though he was provided with Kumho Tire's design and manufacturing specifications and warranty adjustment data." Dkt. No. 81-3 at 24. To the contrary, Mr. Derian explained in his engineering report that the Subject Tire "failed at a small fraction of its expected life," noting specifically that the Kumho Tire warranty covered the tire to 2/32 inch of tread, while the Subject Tire had a minimum of 8/32 inch of tread remaining at the time of the accident. Dkt. No. 81-16 at 6. Thus, Plaintiffs have presented evidence that the Subject Tire departed from the standards set for its product line in at least one respect.

The Tire Defendants also argue that Plaintiffs' manufacturing defect claims fail because Mr. Derian could not identify the cause of the alleged poor adhesion. *See* Dkt. No. 81-3 at 24-25. However, Plaintiffs are correct in their assertion that under New York law, "[a] products liability case can be proven without evidence of any particular defect." *Alexander v. Dunlop Tire Corp.*, 81 A.D.3d 1134, 1135-36 (3rd Dep't 2011) (citing *Speller ex rel. Miller v. Sears, Roebuck & Co.*, 100 N.Y.2d 38, 41 (2003)). "In order to proceed in the absence of evidence identifying a specific flaw, a plaintiff must prove that the product did not perform as intended and exclude all other causes for the product's failure that are not attributable to defendants." *Speller*, 100 N.Y.2d at 41 (internal citations omitted). Here, Mr. Derian identified a specific flaw in the Subject Tire based on his visual and tactile inspection – poor adhesion. Furthermore, he excluded all other potential causes of tire failure other than a manufacturing defect. *See* Dkt. No. 81-16 at 9. The Tire Defendants have identified no precedent that requires Plaintiffs to also explain what happened during the manufacturing process to cause the defect. The Court therefore concludes that Plaintiffs have raised a triable question of fact as to whether the Subject Tire was manufactured defectively. *See Alexander*, 81 A.D.3d at 1136 (finding a triable issue of fact precluding

summary judgment where the plaintiff's expert concluded that a tire tread separation was caused by a manufacturing defect of compromised adhesion integrity based solely on the expert's exclusion of other potential causes of failure).[12]

As to Plaintiffs' negligence claim, the Tire Defendants claim that Plaintiffs have failed to demonstrate that they did not exercise due care during production. *See* Dkt. No. 81-3 at 25. In support of this argument, the Tire Defendants point to Mr. Derian's testimony that the adhesion and endurance tests run by the Tire Defendants were reasonable and complied with Department of Transportation requirements. *See* Dkt. No. 81-22 at 23-24. However, the Tire Defendants' general compliance with Department of Transportation testing requirements is not determinative of whether the Tire Defendants exercised due care in manufacturing the Subject Tire. Plaintiffs have provided proof in the form of Mr. Derian's opinion that the Subject Tire's poor adhesion was caused by an error during the manufacturing process that suffices to create a genuine question of material fact as to whether the Tire Defendants exercised due care in the production of the Subject Tire.

Based on the foregoing, the Court denies the Tire Defendants' motion for summary judgment as to Plaintiffs' manufacturing defect claims.[13]

### 4.    *Failure to warn*

Pursuant to New York law, "[a] manufacturer or distributor of a product may be held

---

[12]  The Court rejects the Tire Defendants' assertion that "there is no evidence to support an allegation that the Subject Tire was not reasonably safe or that the Subject Tire's failure in itself was the proximate cause of Mr. Cruz's injuries." Dkt. No. 81-3 at 25. As the Court discussed above, Plaintiffs sufficiently raised a triable question of fact as to whether the Subject Tire contained a manufacturing defect that rendered it not reasonably safe. In addition, Mr. Derian's and Mr. McCracken's reports each provide evidence that the Subject Tire's failure caused the accident. *See* Dkt. No. 81-16 at 3; Dkt. No. 90-22 at 8.

[13] Plaintiffs have not advanced a manufacturing defect theory as to the Mack Defendants.

liable under a theory of strict products liability when it fails 'to warn against latent dangers resulting from foreseeable uses of its product.'" *Vail v. KMart Corp.*, 25 A.D.3d 549, 551 (2d Dep't 2006) (quoting *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237 (1998)). The duty to warn includes the "duty to warn of the danger of unintended uses of a product provided these uses are reasonably foreseeable." *Liriano*, 92 N.Y.2d at 237 (citations omitted). In order to state a product liability claim on a failure to warn theory, the plaintiff must also prove that the manufacturer's failure to warn was the proximate cause of the plaintiff's harm. *See Colon*, 199 F. Supp. 2d at 84; *Vail*, 25 A.D.3d at 551. "Liability for failure to warn may be imposed 'based upon either the complete failure to warn of a particular hazard or the inclusion of warnings that are insufficient.'" *Fisher v. Multiquip, Inc.*, 96 A.D.3d 1190, 1192 (3d Dep't 2012) (quoting *DiMura v. City of Albany*, 239 A.D.2d 828, 829 (3d Dep't 1997)). "'[T]here is no duty to warn of an open and obvious danger of which the product user is actually aware or should be aware as a result of ordinary observation or as a matter of common sense.'" *Quiles v. Bradford-White Corp.*, No. 10-CV-747, 2012 WL 1355262, *9 (N.D.N.Y. 2012) (quoting *Feele v. W.W. Grainger, Inc.*, 302 A.D.2d 971, 972 (4th Dep't 2003)). "The adequacy of the warning is generally a question of fact for the jury to decide, and 'is not ordinarily susceptible to the drastic remedy of summary judgment.'" *Id.* (quoting *Urena v. Biro Mfg. Co.*, 114 F.3d 359, 366 (2d Cir. 1997)).

The Tire Defendants assert that Plaintiffs have not presented any evidence of warnings they believe should have been provided with the Subject Tire. *See* Dkt. No. 81-3 at 25-26. Plaintiffs have not responded to this argument and have not proffered any evidence as to the necessity for a warning with respect to the Subject Tire. As such, the Court grants the Tire Defendants' motion for summary judgment as to Plaintiffs' failure to warn claims.

The Mack Defendants contend that they had no duty to warn of the prospects of injury that

could result from driving the Subject Truck off the road and into rough terrain because such risk was obvious. *See* Dkt. No. 83-3 at 19-20. This argument misstates Plaintiffs' failure to warn claim. Plaintiffs contend that the Mack Defendants had a duty to warn of the risk of a post-crash fire. *See* Dkt. No. 92 at 31-32. The Mack Defendants do not address this theory of failure to warn liability. *See* Dkt. No. 94 at 9. Plaintiffs allege that the Mack Defendants knew or should have known of the risk of post-collision fire in the Subject Truck based on the Department of Transportation studies referenced *supra* in the discussion of Ms. Shipp's proposed testimony. *See id.* at 31. As Plaintiffs have presented some evidence that the Mack Defendants were or should have been aware of the risks of post-accident fire in the Subject Truck and provided no warnings, *see* Dkt. No. 92-11 at 4, the Court finds that triable issues of fact exist precluding summary judgment. Therefore, the Court denies the Mack Defendants' motion for summary judgment as to Plaintiffs' failure to warn claim.

    **5.**      ***Breach of express warranty***

In New York, "[t]o establish the breach of an express warranty, the plaintiff must show that there was an affirmation of fact or promise by the seller, the natural tendency of which [was] to induce the buyer to purchase and that the warranty was relied upon to the plaintiff's detriment." *Pinello v. Andreas Stihl Ag & Co. KG*, No. 8:08-CV-00452, 2011 WL 1302223 (N.D.N.Y. Mar. 31, 2011) (quotation omitted); *see also Friedman v. Medtronic, Inc.*, 42 A.D.2d 185, 190 (2d Dep't 1973) (stating the same). "The plaintiff must set forth the terms of the warranty upon which he relied." *Barrett v. Black & Decker (U.S.) Inc.*, No. 06 Civ. 1970, 2008 WL 5170200, *12 (S.D.N.Y. Dec. 9, 2008).

Here, Plaintiffs have failed to identify the express warranty upon which they claim to have relied to their detriment or otherwise respond to the Tire Defendants' arguments concerning the

insufficiency of their express warranty claim. Accordingly, the Court grants the Tire Defendants' motion for summary judgment as to Plaintiffs' express warranty claim.[14]

### 6. *Breach of implied warranty*

Pursuant to New York's version of the Uniform Commercial Code ("U.C.C."), "an implied warranty claim asks . . . whether the product was fit for its intended purpose." *Monell v. Scooter Store, Ltd.*, 895 F. Supp. 2d 398, 416 (N.D.N.Y. 2012). "Under a theory of breach of implied warranty of merchantability or breach of implied warranty of fitness for a particular purpose, the inquiry is focused on consumer expectations when the product 'was being used for the purpose and in the manner intended.'" *Id.* (quoting *Beneway v. Superwinch, Inc.*, 216 F. Supp. 2d 24, 30 (N.D.N.Y. 2002)); *see also Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258-59 ("The [U.C.C. defect] inquiry focuses on the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manners."). "A warranty of fitness for ordinary purposes does not mean that the product will fulfill a buyer's every expectation," but rather "provides for a minimum level of quality." *Denny*, 87 N.Y.2d at 258 n.4. As in other product liability actions, in an action pleaded in breach of warranty, "it is a consumer's burden to show that a defect in the product was a substantial factor in causing the injury and . . . that the defect complained of existed at the time the product left the manufacturer or entity in the line of distribution being sued." *Fritz v. White Consol. Indus., Inc.*, 306 A.D.2d 896, 898 (4th Dep't 2003) (quotation omitted).

The Tire Defendants argue that Plaintiffs cannot prove a breach of the implied warranty of merchantability because the Subject Tire "was at least half, if not more, through its useful life when it failed, which certainly qualifies as meeting a minimal standard." Dkt. No. 81-3 at 28-29.

---

[14] Plaintiffs do not allege an express warranty claim against the Mack Defendants.

They also argue that the tread belt separation and detachment could have occurred even if the Subject Tire was not defective and point to cuts and penetrations in the Subject Tire as evidence that the Subject Tire's failure was not caused by a defect that existed in its original condition. *See id.* at 29. These arguments demonstrate that a triable issue of material fact exists as to whether the Subject Tire was fit for its intended purpose at the time of sale. While the Tire Defendants have presented evidence that the Subject Tire failed due to service abuse demonstrated by cuts and punctures, *see* Dkt. No. 90-19 at 166, Plaintiffs have presented evidence that it should have been able to withstand its use, *see* Dkt. No. 81-23 at 3. Furthermore, Plaintiffs proffered evidence that the Subject Tire was marketed as a "mixed-use" tire appropriate for on- and off-road applications. *See* Dkt No. 90-7 at 2; Dkt. No. 90-13 at 28. Plaintiffs contend that Mr. Cruz therefore used the Subject Tire for its intended purpose and in its intended manner. *See* Dkt. No. 90 at 27. Plaintiffs thus contend that the Subject Tire's tread belt detachment "very early in its life" evidences its unfitness for its intended purpose. *Id.* As such, the Court finds that triable issues of fact precluding summary judgment exist as to Plaintiffs' implied warranty claim against the Tire Defendants and denies the Tire Defendants' motion for summary judgment on this claim.

The Mack Defendants assert that Plaintiffs' implied warranty claims against them are barred by the statute of limitations. Pursuant to the New York U.C.C., "an action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." N.Y. U.C.C. § 2-725(1). Claims based on a breach of an implied warranty are subject to this four-year limitation period and accrue "on the date the party charged tenders delivery of the product." *Heller v. U.S. Suzuki Motor Corp.*, 64 N.Y.2d 407, 411 (1985).

The Mack Defendants and Plaintiffs disagree as to whether the Mack Defendants tendered delivery of the Subject Truck to Mr. Glode in 2004 or 2005. *See* Dkt. No. 83-3 at 21; Dkt. No. 92

at 31-32.  While Plaintiffs are correct that the Mack Defendants' reliance on the invoice dated

May 20, 2004 from Ballard to DGCL is unavailing because the invoice does not establish the

delivery date of the Subject Truck, Plaintiffs concede that the only evidence in the record as to the

Subject Truck's delivery indicates that Mr. Glode purchased the truck in 2005.  *See* Dkt. No. 83-

16; Dkt. No. 92-15 at 5.  The dispute as to the date the Mack Defendants tendered delivery is

therefore immaterial.  Even construing the facts in the light most favorable to Plaintiffs and

accepting a 2005 delivery date, Plaintiffs' filing of their complaint against the Mack Defendants in

2012 is plainly well outside the four-year statute of limitations.  Accordingly, the Mack

Defendants' motion for summary judgment as to Plaintiffs' implied warranty claims is granted.

### 7. *Consortium*

"[A] spouse's action for loss of consortium is derivative, and not independent, of the

injured spouse's claim."  *Young v. Robertshaw Controls Co.*, 104 A.D.2d 84, 88 (3rd Dep't

1984)); *see also Arneauld v. Pentair, Inc.*, No. CV-11-3891, 2012 WL 5932956, *21 (E.D.N.Y.

Nov. 26, 2012) (dismissing wife's claim for loss of consortium because all of her husband's

substantive claims were dismissed).  Because a number of Mr. Cruz's substantive claims survive

Defendants' motions for summary judgment, Mrs. Cruz's loss of consortium claims survive as

well.

### 8. *Claims against Dacotah-Walsh and Ballard*

"Strict products liability . . . appropriately applies to sellers who engage in product sales in

the ordinary course of their business because such sellers 'may be said to have assumed a special

responsibility to the public, which has come to expect them to stand behind their goods.'"  *Sprung

v. MTR Ravensburg*, 99 N.Y.2d 468, 473 (2003) (quoting *Suklijan v. Ross & Son Co.*, 69 N.Y.2d

89, 95 (1986)).  "Although a retailer is not generally liable in negligence for the sale of a

defective product, it is under a duty to inspect for and discover such defects 'as a reasonable physical inspection would disclose.'" *Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 844 (E.D.N.Y. 1995) (quoting *Naples v. City of New York*, 34 A.D.2d 577, 578 (2d Dep't 1970)). "[W]hen a vendor buys a product from a reputable source of supply, he has 'reasonable grounds for believing the chattel to be free from defects.'" *Id.* (quoting *Outwater v. Miller*, 3 A.D.2d 670, 670 (2d Dep't 1957)). "In the motor vehicle industry specifically, [a] dealer in new motor vehicles manufactured by a manufacturer of national reputation is not under a duty: to inspect such a vehicle to discover latent defects, nor is the dealer liable for an injury resulting from such a defect which was unknown to the dealer." *Noveck v. PV Holdings Corp.*, 742 F. Supp. 2d 284, 300 (E.D.N.Y. 2010) (quotation omitted). "[W]here a retailer has sold a dangerous product without providing an adequate warning of that danger, and that product has injured a user, the retailer may be liable to the user under a 'failure to warn' theory of liability if the retailer knew or had reason to know that the product was dangerous, or was likely to be dangerous, when used." *Topliff v. Wal-Mart Stores East LP*, No. 6:04-CV-0297, 2007 WL 911891, *28 (N.D.N.Y. Mar. 22, 2007) (emphasis omitted).

The Tire Defendants acknowledge that as a tire retailer, Dacotah-Walsh could conceivably be liable in strict liability, negligence, or failure to warn. They argue, however, that Plaintiffs' claims against Dacotah-Walsh must be dismissed because Plaintiffs have proffered no proof that Dacotah-Walsh sold the Subject Tire. *See* Dkt. No. 81-3 at 30. Plaintiffs have not addressed this argument. Upon review of the record, the Court finds that the Tire Defendants are correct in asserting that Plaintiffs cannot prove that Dacotah-Walsh in fact sold the Subject Tire. The evidence is ambiguous at best as to whether Mr. Glode purchased the Subject Tire from Dacotah-Walsh or Terry's Title Town. *See* Dkt. No. 81-40 at 6, 14; Dkt. No. 81-47 at 1. Accordingly, the

Court grants Dacotah-Walsh's motion for summary judgment as to all claims against it.

The Mack Defendants argue that "[t]he claims against Ballard are derived from the claims against Mack" and therefore must be dismissed to the extent that the claims against Mack are dismissed. Dkt. No. 83-3 at 22; *see also* Dkt. No. 94 at 11 ("There is no independent liability for Ballard since it is being sued only derivatively as a vendor of the truck."). As set forth above, New York law recognizes strict products liability for vendors engaged in product sales in the ordinary course of business. As Ballard is indisputably one such vendor, the Mack Defendants' motion for summary judgment as to the strict liability claim against Ballard is denied. Plaintiffs offer no argument in support of holding Ballard liable under a negligence or failure to warn theory. *See* Dkt. No. 92 at 32-33. In light of the fact that under New York law, Ballard did not have a duty to inspect the Subject Truck, the Court grants Ballard's motion for summary judgment as to Plaintiffs' negligence claim. In addition, Plaintiffs have proffered no evidence that Ballard knew or had reason to know that the Subject Truck was dangerous or likely to be dangerous, as is required to hold a retailer liable under a failure to warn theory. Accordingly, the Court also grants Ballard's motion for summary judgment as to Plaintiffs' failure to warn claim.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the Tire Defendants' motion to preclude the testimony of Gary A. Derian is **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** that the Tire Defendants' motion to preclude the testimony of Gary A. Derian is **GRANTED** as to testimony regarding a design defect opinion; and the Court further

**ORDERS** that the Tire Defendants' motion to preclude the testimony of Gary A. Derian is **DENIED** as to testimony regarding a manufacturing defect opinion and **DENIED without prejudice to renew** as to testimony regarding an accident causation opinion; and the Court further

**ORDERS** that the Tire Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**; and the Court further

**ORDERS** that the Tire Defendants' motion for summary judgment is **GRANTED** as to Plaintiffs' design defect strict liability and negligence claims, failure to warn claim, breach of express warranty claim, and claims against Dacotah-Walsh; and the Court further

**ORDERS** that the Tire Defendants' motion for summary judgment is **DENIED** as to Plaintiffs' manufacturing defect strict liability and negligence claims, breach of implied warranty claim, and loss of consortium claim; and the Court further

**ORDERS** that Defendant Dacotah-Walsh Tire Incorporated is **DISMISSED** from this action; and the Court further

**ORDERS** that the Mack Defendants' motion to preclude the testimony of Erin Shipp, Wayne McCracken, and David Smith is **DENIED**; and the Court further

**ORDERS** that the Mack Defendants' motion for summary judgment is **GRANTED** in part and **DENIED in part**; and the Court further

**ORDERS** that the Mack Defendants' motion for summary judgment is **GRANTED** as to Defendant Mack Trucks, Inc. as to Plaintiffs' breach of implied warranty claim; and the Court further

**ORDERS** that the Mack Defendants' motion for summary judgment is **DENIED** as to Defendant Mack Trucks, Inc. as to Plaintiffs' design defect strict liability and negligence claims,

failure to warn claim, and loss of consortium claim; and the Court further

**ORDERS** that the Mack Defendants' motion for summary judgment is **GRANTED** as to

Defendant Ballard Mack Sales & Service, Inc. as to Plaintiffs' design defect negligence claim,

failure to warn claim, and breach of implied warranty claim; and the Court further

**ORDERS** that the Mack Defendants' motion for summary judgment is **DENIED** as to

Defendant Ballard Mack Sales & Service, Inc. as to Plaintiffs' design defect strict liability claim

and loss of consortium claim; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order in accordance with the Local Rules.[15]

**IT IS SO ORDERED.**

Dated: May 11, 2015
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[15] As a result of this order, Plaintiffs' following claims remain in this action: (1) manufacturing defect strict liability claim against Defendants KTCI and KTUI; (2) manufacturing defect negligence claim against Defendants KTCI and KTUI; (3) breach of implied warranty claim against Defendants KTCI and KTUI; (4) design defect strict liability claim against Defendants Mack and Ballard; (5) design defect negligence claim against Defendant Mack; (6) failure to warn claim against Defendant Mack; and (7) loss of consortium claims against all remaining defendants.